Case No.: 23-10811-D

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CLEMENTE AGUIRRE-JARQUIN,
    Plaintiff/Appellee/Cross-Appellant

v.

DONNA BIRKS, ET AL.,
    Defendants/Appellants/Cross-Appellees

and

SHERIFF DENNIS LEMMA,
    Defendant/Cross-Appellee.

---

Appeal from the United States District Court
for the Middle District of Florida, Orlando Division
Case No.: 6:20-cv-25-Orl-37DCI

---

## INITIAL BRIEF OF APPELLANTS HEMMERT AND GROSSI

THOMAS W. POULTON, ESQ.
Florida Bar No.: 0083798
*poulton@debevoisepoulton.com*
ROBERT D. HOLBORN, II, ESQ.
Florida Bar No.: 0044186
*holborn@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida 32792
Telephone: 407-673-5000
Attorneys for Defendants/Appellants
Hemmert and Grossi, and Defendant/Cross-
Appellee Seminole County Sheriff Dennis
Lemma.

Case No.:  23-10811-D

*Clemente Aguirre-Jarquin v. Donna Birks, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**Clemente Javier Aguirre-Jarquin – Plaintiff/Appellee/Cross-Appellant**

**Donna Birks – Defendant/Appellant**

**Black Srebnick Kornspan Stumpf – Attorneys for**
       **Plaintiff/Appellee/Cross-Appellant**

**Honorable Roy B. Dalton, Jr. - District Judge in court below**

**DeBevoise & Poulton, P.A. – Attorneys for Defendants/Appellants/Cross-Appellees Robert Hemmert and Jacqueline Grossi and Defendant/Cross-Appellee Sheriff Lemma**

**George Ryan Dietrich - Attorney for Defendant/Appellant Birks**

**Joshua Dubin – Attorney for Plaintiff/Appellee/Cross-Appellant**

**Fisher Rushmer, P.A. - Attorneys for Defendant/Appellant Birks**

**Florida Sheriffs Risk Management Fund – Liability Coverage for Attorneys for Defendants/Appellants/Cross-Appellees Robert Hemmert and Jacqueline Grossi and Defendant/Cross-Appellee Sheriff Lemma**

**Grant & Eisenhofer, P.A. - Attorney for Plaintiff/Appellee/Cross-Appellant**

**Jeffrey K. Grant – Attorney for Defendants/Appellants/Cross-Appellees Robert Hemmert and Jacqueline Grossi and Defendant/Cross-Appellee Sheriff Lemma**

**Jacqueline Grossi – Defendant/Appellant/Cross-Appellee**

C1 of 3

**Robert Hemmert – Defendant/Appellant/Cross-Appellee**

**Robert D. Holborn, II - Attorney for Defendants/Appellants/Cross-Appellees Robert Hemmert and Jacqueline Grossi and Defendant/Cross-Appellee Sheriff Lemma**

**Hollifield Legal Centre - Attorney for Plaintiff/Appellee/Cross-Appellant**

**Travis Hollifield - Attorney for Plaintiff/Appellee/Cross-Appellant**

**Honorable Daniel C. Irick - Magistrate Judge in court below**

**Joshua Dubin, P.A. – Attorneys for Plaintiff/Appellee/Cross-Appellant**

**Walter Ketcham, Jr. - Attorney for Defendant/Appellant Birks**

**Irene R. Lax -  Attorney for Plaintiff/Appellee/Cross-Appellant**

**Dennis Lemma, Sheriff of Seminole County – Defendant/Cross-Appellee**

**Ken S. Massey - Attorney for Plaintiff/Appellee/Cross-Appellant**

**Brian F. Moes – Attorney for Defendant Birks/Appellant**

**Thomas W. Poulton – Attorney for Defendants/Appellants/Cross-Appellees Robert Hemmert and Jacqueline Grossi and Defendant/Cross-Appellee Sheriff Lemma**

**Rudolf Widenhouse – Attorneys for Plaintiff/Appellee/Cross-Appellant**

**David S. Rudolf – Attorney for Plaintiff/Appellee/Cross-Appellant**

**Benjamin S. Waxman – Attorney for Plaintiff/Appellee/Cross-Appellant**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5, Defendants/Appellants/Cross-Appellees Hemmert and Grossi and Defendant/Cross-Appellee Sheriff Lemma have no corporations to disclose.

## STATEMENT REGARDING ORAL ARGUMENT

Defendants Grossi and Hemmert (and Sheriff Lemma as to the cross-appeal) all request oral argument. This case involves an appeal from an erroneous denial of qualified immunity in which the district court incorrectly found that Defendants Grossi and Hemmert violated Plaintiff Aguirre's clearly established constitutional rights during a homicide investigation. The entitlement to qualified immunity is based on the undisputed facts, but the facts are complicated, spanning a number of years. Oral argument would assist the Court in understanding the voluminous record and highlighting the material legal errors made by the district court in denying summary judgment.

## **TABLE OF CONTENTS**

Page(s)

Certificate of Interested Persons ............................................................. C1

Statement Regarding Oral Argument ........................................................ i

Table of Contents ............................................................................... ii

Table of Citations ............................................................................... v

Statement of Jurisdiction..................................................................... xi

    (i)     Basis for the District Court's Subject-Matter Jurisdiction.................. xi

    (ii)    Basis for the Court of Appeals' Jurisdiction ........................................ xi

         A.     Jurisdiction over the February 22, 2023, Order denying summary judgment on Plaintiff's §1983 claims against Defendants Hemmert and Grossi ................................................................ xi

         B.     Jurisdiction over the February 22, 2023, Order Denying the Grant of State Immunity to Grossi and Hemmert.................. xiii

Statement of the Issues...................................................................... 1

    1.     Whether Appellants Hemmert and Grossi are entitled to summary judgment on Appellee Aguirre's §1983 malicious prosecution and inadequate investigation claims because the undisputed facts show that Hemmert and Grossi did not violate Aguirre's constitutional rights.... 1

    2.     Whether Appellants Hemmert and Grossi are entitled to summary judgment because the undisputed facts show that they did not violate any clearly established law................................................................. 1

    3.     Whether the district court improperly denied immunity to Hemmert and Grossi on the state law claim against them, based on §768.28(9)(a), Fla. Stat...................................................................................... 1

Statement of the Case.................................................................................2

    (i)    Course of Proceedings and Disposition in the Court Below................2

    (ii)    Statement of the Facts ...........................................................5

    (iii)    Standard of Review ...........................................................24

Summary of the Argument.......................................................................26

Argument and Citations of Authority ....................................................29

    I.    HEMMERT AND GROSSI ARE ENTITLED TO SUMMARY JUDGMENT ON THE §1983 CLAIMS FOR MALICIOUS PROSECUTION AND FOR CONSTITUTIONALLY INADEQUATE INVESTIGATION. NEITHER HEMMERT NOR GROSSI VIOLATED AGUIRRE'S CONSTITUTIONAL RIGHTS AND BOTH OF THEM ARE AT LEAST ENTITLED TO QUALIFIED IMMUNITY FROM SUIT................................................................29

        A.    Qualified immunity standard applicable to all §1983 claims ...29

        B.    Hemmert is entitled to judgment on Aguirre's claim in Count III for violation of a constitutional right to be free from malicious prosecution .............................................................32

            1.    The Fourth Amendment is not the correct foundation for a §1983 malicious prosecution claim, and even if it were, the fact of a grand jury indictment in this case terminated the Fourth Amendment as the basis for a claim based on Aguirre's continued detention, breaking the chain of causation .......................................................................32

            2.    Even if the correct analysis of the §1983 malicious prosecution claim depends on presence or absence of probable cause or arguable probable cause, the district court erred in denying summary judgment to Hemmert as probable cause or at least arguable probable cause to arrest Aguirre was patently obvious........................................36

3.    The investigation was constitutionally adequate so as to establish probable cause, or at least arguable probable cause, to arrest Aguirre ....................................................42

C.    Hemmert and Grossi are entitled to judgment on Aguirre's claim in Count IV for violation of a constitutional right to a constitutionally adequate investigation.....................................50

1.    The district court order confuses probable cause for Fourth Amendment purposes with due process .........................50

2.    Grossi is entitled to qualified immunity .........................54

II.    HEMMERT AND GROSSI ARE ENTITLED TO SUMMARY JUDGMENT ON THE STATE LAW CLAIM AND BOTH OF THEM ARE AT LEAST ENTITLED TO IMMUNITY FROM THIS CLAIM PURSUANT TO §768.28(9)(a), FLA. STAT....................................56

Conclusion  ...........................................................................................58

Certificate of Compliance .........................................................................59

Certificate of Service ..............................................................................60

iv

## **TABLE OF CITATIONS**

Page(s)

## **CASES**

*Aguirre-Jarquin v. State*,

    9 So.3d 593 (Fla. 2009) ...................................................................2

*Aguirre-Jarquin v. State*,

    202 So.3d 785 (Fla. 2016) .........................................................2, 24

*Albright v. Oliver*,

    510 U.S. 266 (1994)........................................................................51

*Anderson v. Creighton,*

    483 U.S. 635 (1987)........................................................................31

*Baker v. McCollan*,

    443 U.S. 137 (1979)........................................................................50

*Barts v. Joyner*,

    865 F.2d 1187 (11th Cir. 1989) ...............................................33, 34

*Brady v. Maryland*,

    373 U.S. 83 (1963)........................................................................3, 4

*Butler v. Gualtieri,*

    41 F.4th 1329 (11th Cir. 2022) ................................................... xiii

*Case v. Eslinger*,

     555 F.3d 1317 (11th Cir. 2009) ...................................................................52

*City of Pensacola v. Owens*,

     369 So. 2d 328 (Fla. 1979) ......................................................................... xii

*Coffin v. Brandau*,

     642 F.3d 999 (11th Cir. 2011) ...................................................................31

*Coleman v. Hillsborough Cnty.*,

     41 F.4th 1319 (11th Cir. 2022) ..................................................................57

*Cottrell v. Caldwell*,

     85 F.3d 1480 (11th Cir. 1996) ................................................................... xii

*Daniels v. Bingo*,

     487 Fed.App'x 532 (11th Cir. 2012) ..........................................................53

*Deville v. Marcantel*,

     567 F.3d 156 (5th Cir. 2009) .....................................................................34

*Eubanks v. Freburger*,

     Case No. 11-60714-CIV, 2012 WL 4936061 (S.D. Fla. Oct. 17, 2012).......56

*Feliu v. Fernandez Rundle*,

     Case No. 05-20169 CIV, 2007 WL 1463866 (S.D. Fla. May 17, 2007).......57

*Florida Highway Patrol v. Jackson*,

     288 So. 3d 1179 (Fla. 2020) ..................................................................... xiii

*Franks v. Delaware*,

    438 U.S. 154 (1978)........................................................................47

*Frias v. Demings*,

    823 F.Supp.2d 1279 (M.D. Fla. 2011) ..........................................56

*Grider v. City of Auburn, Ala.*,

    618 F.3d 1240 (11th Cir. 2010) ...............................................36, 37

*Helm v. Rainbow City*,

    989 F.3d 1265 (11th Cir. 2021) ....................................................52

*Johnson v. Clifton*,

    74 F.3d 1087 (11th Cir. 1996) ......................................................xi

*Jones v. Cannon*,

    174 F.3d 1271 (11th Cir. 1999) ...........................................33, 34, 47

*Kingsland v. City of Miami*,

    382 F.3d 1220 (11th Cir. 2004) .........................................25, 37, 40

*Lassiter v. Alabama A & M Univ.,*

    28 F.3d 1146 (11th Cir.1994) ............................................29, 31, 48

*Lee v. Ferraro*,

    284 F.3d 1188 (11th Cir. 2002) ....................................................30

*Lewis v. City of West Palm Beach*,

    561 F.3d 1288 (11th Cir. 2009) ....................................................30

*Luke v. Gulley*,

    975 F.3d 1140 (11th Cir. 2020) ........................................................36

*Madiwale v. Savaiko*,

    117 F.3d 1321 (11th Cir. 1997) ......................................................47

*Manuel v. City of Joliet*,

    580 U.S. 357 (2017)..............................................................34, 35

*Marsh v. Butler Cnty., Ala.*,

    268 F.3d 1014 (11th Cir. 2001) ......................................................30

*Marx v. Gumbinner*,

    905 F.2d 1503 (11th Cir. 1990) ......................................................50

*Mastroianni v. Bowers,*

    173 F.3d 1363 (11th Cir.1999) ...................................................33, 34

*Mercado v. City of Orlando*,

    407 F.3d 1152 (11th Cir. 2005) ......................................................51

*Mitchell v. Forsyth*,

    472 U.S. 511 (1985).................................................................xi

*Monell v. Dep't of Social Servs.*,

    436 U.S. (1978)...................................................................3, 4

*Moniz v. City of Fort Lauderdale,*

    145 F.3d 1278 (11th Cir.1998) ..................................................... xii

*Ortega v. Christian*,

    85 F.3d 1521 (11th Cir.1996) ........................................................52

*Parker v. State Bd. of Regents ex rel. Fla. State Univ.*,

    724 So.2d 163 (Fla. 1st DCA 1998) .............................................57

*Pearson v. Callahan*,

    555 U.S. 223 (2009)......................................................................29

*Sada v. City of Altamonte Springs*,

    434 Fed. Appx. 845 (11th Cir. 2011) ...........................................56

*Saucier v. Katz*,

    533 U.S. 194 (2001)................................................................29, 31

*Sierra v. Associated Marine Insts., Inc.*,

    850 So.2d 582 (Fla. 2d DCA 2003)...............................................58

*Skop v. City of Atlanta*,

    485 F.3d 1130 (11th Cir. 2007) ....................................................25

*Thompson v. Clark*,

    ___U.S.___, 142 S. Ct. 1332 (April 4, 2022)................................32

*Tillman v. Coley*,

    886 F.2d 317 (11th Cir. 1989) ................................................48, 49

*Vinyard v. Wilson*,

    311 F.3d 1340 (11th Cir. 2002) ..............................................30, 31

## STATUTES

§768.28(9)(a), Fla. Stat ................................................................*passim*

28 U.S.C. §1331 ..........................................................................xi

28 U.S.C. §1367 ..........................................................................xi

42 U.S.C. §1983 ...........................................................................*passim*

## OTHER AUTHORITIES

U.S. Const. Amend. IV ................................................................*passim*

U.S. Const. Amend. XIV ...............................................................3

Fed. R. App. P. 26.1 .....................................................................C1

Fed. R. App. P. 32(a)(7)(B) .........................................................59

11th Cir. R. 26 1-1 through 26.1-5..............................................C1

11th Cir. R. 32-4 ..........................................................................59

## STATEMENT OF JURISDICTION

(i)    **Basis for the District Court's Subject-Matter Jurisdiction**

The district court had subject matter jurisdiction of this action, brought under 42 U.S.C. §1983, pursuant to 28 U.S.C. §1331, and had supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

(ii)    **Basis for the Court of Appeals' Jurisdiction**

A.    **Jurisdiction over the February 22, 2023, Order denying summary judgment on Plaintiff's § 1983 claims against Defendants Hemmert and Grossi.**

This Court has jurisdiction pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 525-30 (1985) over that portion of the district court's February 22, 2023, summary judgment order (ECF 297) denying summary judgment to Appellants Hemmert and Gross based on qualified immunity. This appeal implicates "core qualified immunity" issues, and as such is "immediately appealable." *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Appellants' arguments in support of this appeal are based exclusively on facts which are undisputed. In the rare instances where there are disputes of fact, they are not legally relevant but are nonetheless discussed in terms of Appellee Aguirre's version of events.

An order denying a claim of qualified immunity is final and appealable if it "turns on an issue of law." *Mitchell*, 472 U.S. at 525. In this case, the district court

erred in determining as a matter of law that Aguire has established a triable case as to a constitutional violation. The question of "whether the plaintiff has asserted a violation of a constitutional right at all… is a legal one and therefore subject to interlocutory review." *Cottrell v. Caldwell*, 85 F.3d 1480, 1485 (11th Cir. 1996).

The district court further erred in determining that the constitutional rights allegedly violated were clearly established at the time of the investigation. *Moniz v. City of Fort Lauderdale,* 145 F.3d 1278, 1281 (11th Cir.1998). ("[A] denial [of qualified immunity] remains immediately appealable to the extent that it turns on 'an "abstract issu[e] of law" relating to qualified immunity—typically, the issue whether the federal right allegedly infringed was "clearly established"). The district court erred in determining that no probable cause, or even arguable probable cause, existed for Plaintiff's arrest. This is a legal question. "What facts and circumstances amount to probable cause is a pure question of law." *City of Pensacola v. Owens*, 369 So. 2d 328, 330 (Fla. 1979).[1]

---

[1] On August 1, 2023, all parties filed a joint motion to enlarge the time for all briefs, including this one, and for expanded word counts. The motion has not been acted upon and so Hemmert and Grossi file this Initial Brief on the current due date. Should the Court grant the pending motion, Hemmert and Grossi will submit a Corrected Initial Brief, accordingly.

**B.** **Jurisdiction over the February 22, 2023, Order Denying the Grant of State Immunity to Grossi and Hemmert.**

This Court has jurisdiction pursuant to *Butler v. Gualtieri*, 41 F.4th 1329, 1335 (11th Cir. 2022), over the district court's denial of official immunity to Defendants Hemmert and Grossi, pursuant to §768.28(9)(a), Fla. Stat. "In Florida, sovereign immunity is both an immunity from liability and an immunity from suit." *Florida Highway Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020). As a result, "[w]e are now obliged to consider the denial of sovereign immunity on an interlocutory basis." *Butler*, 41 F.4th at 1335–36.

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether Appellants Hemmert and Grossi are entitled to summary judgment on Appellee Aguirre's §1983 malicious prosecution and inadequate investigation claims because the undisputed facts show that Hemmert and Grossi did not violate Aguirre's constitutional rights.

2.       Whether Appellants Hemmert and Grossi are entitled to summary judgment because the undisputed facts show that they did not violate any clearly established law.

3.      Whether the district court improperly denied immunity to Hemmert and Grossi on the state law claim against them, based on §768.28(9)(a), Fla. Stat.

1

## STATEMENT OF THE CASE

**(i)     Course of proceedings and disposition below.**

This is a §1983 and state law case involving the arrest and prosecution of Plaintiff Clemente Jarquin-Aguirre ("Aguirre") for the murder of two women, Cheryl Williams and Carol Bareis. The murders occurred in 2004 and, after being indicted by a grand jury, Aguirre was tried and convicted of both murders by a jury in 2006 and sentenced to death.  The conviction and sentence were upheld by the Florida Supreme Court.  *Aguirre-Jarquin v. State*, 9 So.3d 593 (Fla. 2009).

In 2010, some four years after the conviction, the daughter of Cheryl, Samantha Williams, made self-incriminating comments about the murders. [2]    A second round of attorneys for Aguirre conducted further investigation.  The Florida Supreme Court then vacated Aguirre's conviction after additional testing of blood evidence revealed that a handful of droplets of blood in the home included the DNA of the daughter, who was living in the same home.  *Aguirre-Jarquin v. State*, 202 So.3d 785 (Fla. 2016).  Even after that opinion was issued, the State Attorney's Office continued to prosecute Aguirre for another two years before the case was nolle prossed.

---

[2] Cheryl and Samantha Williams will be referred to by their first names, Bareis by her last.

Aguirre filed suit.  The operative complaint is the Third Amended Complaint (ECF 111)[3] alleging the following causes of action:

Count I – Fourteenth Amendment Due Process claim against Donna Birks

Count II – Fourteenth Amendment *Brady*[4] claim against Robert Hemmert

Count III – Fourth Amendment Malicious Prosecution claim against Birks and Hemmert

Count IV – Fourteenth Amendment Inadequate Investigation claim against Hemmert and Jacqueline Grossi

Count V – *Monell*[5] Inadequate Training claim against Sheriff Lemma

Count VI – *Monell* Inadequate Training claim against Sheriff Lemma

Count VII – State law Intentional Infliction of Emotional Distress ("IIED") claim against Hemmert, Grossi, and Birks

On October 14, 2020, Defendants Lemma, Hemmert, and Grossi filed their Answer (ECF 114).  Defendants Hemmert and Grossi asserted the defense of qualified immunity from all §1983 claims and the defense of immunity for all state law claims pursuant to §768.28(9)(a), Fla. Stat.

---

[3] All citations to the record will be to the district court docket in the form of "ECF" (Electronic Case Filing) and document number followed by the pager number.

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

[5] *Monell v. Dep't of Social Servs*., 436 U.S. (1978).

3

On May 4, 2022, Sheriff Lemma, Hemmert, and Grossi moved the district court for summary judgment (ECF 236). Birks filed a separate Motion for Summary Judgment. (ECF 185). Aguirre filed his response in opposition to both of these motions on June 24, 2022 (ECF 233, 234), and the district court issued its ruling on February 22, 2023 (ECF 297).

As regards Hemmert, Grossi, and the Sheriff, the district court's order granted summary judgment as to Counts II, V, and VI (*Brady* claim against Hemmert and the *Monell* claims). The district court denied summary judgment on Counts III (malicious prosecution against Hemmert), IV (due process against Hemmert and Grossi), and VII (IIED against Hemmert and Grossi).[6]

Hemmert and Grossi filed a timely notice of appeal on March 13, 2023 (ECF 301) as to the district court's denial of summary judgment based on qualified immunity as to the §1983 claims in Counts III and IV, and the denial of official immunity as to the state law IIED claim in Count VII.

---

[6] Aguirre sought to dismiss the malicious prosecution claim but the district court denied that request.

(ii)      **Statement of the Facts.**

### 121 and 117 Vagabond Way

In June 2004, Cheryl, 47, Bareis, 68 (Cheryl's mother), and Samantha, 21, lived at 121 Vagabond Way in Altamonte Springs, Fla.  The home was comprised of two trailers with a shared enclosed hallway. (ECF 187, p. 85).

Next door at 117 Vagabond Way lived Guillermo Espinosa and Feliciano Espinosa Sequeida.  Behind the Espinosa house was a shed.  Appellee Aguirre lived in the shed.  (Id., p. 23-24).

### Murder of Cheryl Williams and Carol Bareis

On June 17, 2004, at 9 a.m., the murdered body of Cheryl was discovered by Mark Van Sandt at the victims' home.  The front door was unlocked but Van Sandt had trouble opening the door.  He was able to push the door open enough to see the body of Cheryl. (ECF 236-1, pp. 58-60). Van Sandt called 911 and described Cheryl as covered in blood. (ECF 236-2, pp. 2-4).  The operator told him to move her body so that she would be on her back to do CPR. (Id., p. 3). Van Sandt attempted this but stopped and did not continue stating "Oh my God, her pants are down". (Id.).

The operator told Van Sandt that she would walk him through CPR but Van Sandt stated "No, she's cold… and very stiff." [7] (Id., p. 4). The operator asked Van Sandt if Cheryl lived alone and he replied that his girlfriend Samantha and Bareis lived there but that Samantha was at his house sleeping. (Id., p.4). Van Sandt stated he would go further inside the residence to look for Bareis, but the operator told him not to do so and to wait outside for deputies so as not to disturb the crime scene. (Id., pp. 4-5).

Deputies Ross Pensa, Kristen Bates, and Matthew Miller of the Seminole County Sheriff's Office arrived. Miller stayed with Van Sandt while Pensa and Bates went to the front door. They saw Cheryl's body through the glass panel next to the door, face down on the ground. (ECF 236-1, p. 745). Pensa went around back to gain entry. (Id.).

Van Sandt told Miller that he found Cheryl's body when he came to the house to retrieve Samantha's laundry. He and Samantha left the house the prior night at 11:00 p.m. Van Sandt stated the next-door neighbor known to him as "Little Mexico," was found in the Williams' residence the week prior at 5:00 a.m. and that Cheryl told him to leave. (ECF 236-5, p. 37).

---

[7] Van Sandt testified he touched her arm or leg for less than one second. (ECF 236-4, p. 961).

Cheryl was located inside the residence, at the front door, face down with her shorts pulled down past her buttocks. (ECF 236-6, p. 15). Neither Pensa nor Bates touched Cheryl's body, and Bates noted shoe prints in blood on the floor. (Id., p. 17). Paramedic David Grant arrived on scene at 9:06 a.m. and pronounced Cheryl dead but did not touch Cheryl's body or take its temperature. (ECF 236-7, p. 21). Deputies followed protocol in not touching the body until the medical examiner gave permission.[8] (ECF 236-4, pp. 40-41).

About one hour later, Van Sandt asked Grant and Pensa where the grandmother, Bareis, was. (ECF 236-7, pp. 7-8; 236-5, p. 37). Deputies reentered the residence, calling Grant to reenter when they found Bareis' body. He declared her dead at 10:07 a.m. (ECF 236-7, pp. 31 and 37). Bareis was located in a room just off the hallway where Cheryl was located, behind a closed door. Bareis, in her wheelchair, was stabbed twice from behind, once in her chest piercing her heart. (ECF 236-1, pp. 655-661).

## Investigation

Robert Hemmert, a major crimes investigator and Jacqueline Grossi, a crime scene analyst, were both employed by the Seminole County Sheriff's Office.

---

[8] The Medical Examiner testified that he "insists" that no one move a body until he or his staff is on scene. (ECF 236-4, p. 41).

Hemmert was assigned to lead the investigation and Grossi was lead crime scene analyst. Hemmert had been assigned to the Major Crimes Unit for the past seven years and in that role, he investigated deaths that were not natural including homicides and other serious crimes. (ECF 193, pp. 11-12, 15). Grossi had a master's in forensic science and had previously assisted in five other homicide investigations.

Both Hemmert and Grossi arrived at about 9:50 a.m. (ECF 236-8, p. 5-6). Hemmert and Grossi observed the bodies of Cheryl and Bareis. Hemmert determined that a search warrant should be obtained so as to prevent any compromise of the value of the criminal investigation. (ECF 236-5, p. 54; ECF 193, p. 94). In making this decision he consulted with Donna Scott, the on-call Homicide Attorney at the State Attorney's Office. (ECF 193, p. 95; ECF 236-9, p. 3).

Deputies began canvassing the neighborhood. Jeffrey Bean and Walter Perez went to 117 Vagabond Way, the home next to the murder scene, and spoke to Aguirre for the first time. Aguirre denied any knowledge of the murders. (ECF 236-12, p. 2). Aguirre provided a written statement, in Spanish, which reported that the night before the murders he was at Pretzel's Billiards until 2 a.m., that he then went to his friend Salvador's house, drinking until 5:45 or 6 a.m., and then went home to sleep. He said he did not know the neighbors well. (ECF 236-13).

8

At 11:23 a.m., Bean interviewed Michael Weaver. (ECF 236-11).  Weaver told Bean that Cheryl had come to the house the night before, at 10 p.m., and spoke with his girlfriend, Diane Shroyer. (Id., p. 4-5).  Cheryl told Weaver and Shroyer that she had just been in an argument with Samantha about spilled ice cubes on the floor. (Id.). Cheryl went back home around 11 p.m.  Shroyer entered the room near the conclusion of this interview.  (Id., p. 7).

Van Sandt was interviewed by Hemmert and Sergeant John Negri from 11:30 a.m. until 12:25 pm. Van Sandt told them that he and Samantha had been at the Williams residence from 7:30 p.m. until 11:30 p.m.  (ECF 236-14, p. 3).  Cheryl and Samantha had an argument over spilled ice cubes.  Van Sandt and Samantha then left to go to Van Sandt's parents' house. (Id., p. 12).   Van Sandt said that Samantha had intermittent explosive personality disorder and that she had been Baker Acted in the past because of a nervous breakdown. (Id., p. 27).[9]

Van Sandt explained that Samantha was scheduled to work on the 17th and needed her clothes from the Williams' home. Van Sandt went to retrieve the clothes to bring them back to his parents' home since the Williams dryer did not work. (Id., p. 5).  He noted that a neighbor named "Little Mexico" had recently been found in

---

[9] The district court in the summary judgment order embellished this by characterizing Samantha as "prone to violence."  That phraseology was not defined in the order and has no record citation.   (ECF 297, p. 4).

the Williams residence at 5:00 a.m., unannounced, and told not to do that again.  (Id., pp. 7, 16).

Van Sandt established an alibi for Samantha, saying that they did not leave the house and that she never left him. (Id., pp. 25-26).  Hemmert asked Van Sandt numerous questions as to Samantha's alibi.  Van Sandt stated that he was absolutely certain that Samantha never left his parents' house that night and confirmed she was there at several points when he woke up.  He also noted that Samantha did not drive and had no license.  (Id., pp. 14, 27).  He explained that he had to hide his relationship with Samantha from his parents because they did not approve of her; however his mother knew that Samantha would sometimes stay the night. (ECF 236-14, p. 34-35).

At around 1:30 p.m., Samantha Williams was transported from the Van Sandt residence to the crime scene and interviewed by Hemmert and Negri until 2:30 p.m. (ECF 236-16).  Samantha stated that she had gotten into an argument with Cheryl the night before and left at about 11 p.m.  (Id., p. 10).

Initially, Samantha stated that she and Van Sandt stayed the night at the house of a friend but after Hemmert told her she had to be truthful she stated that the couple stayed the night at Van Sandt's parents' house. She explained that she originally

10

answered differently because Van Sandt's parents did not like her staying at their house. (Id., pp. 10-11). Hemmert accepted this explanation.

Samantha reported at least three prior occasions in which Aguirre had been found in the Williams home, uninvited and unannounced. (Id., p. 19-20). Samantha reported that Aguirre had the "other week" walked in at 5 a.m., and that on one other occasion she woke up in her bed at 3 a.m. to find Aguirre standing over her. (Id., p. 20).

A bloodied knife was found in the yard of 117 Vagabond where Aguirre lived. The chef style 10-inch knife was placed into evidence as item JO-8. The knife was swabbed for DNA. A latent print was detected, photographed, and forwarded for examination. (ECF 236-5, p. 39).

Aguirre returned to the area late in the day on the 17th and, when he returned, Theresa Maiorana and Negri conducted a recorded interview of him on scene at 7:28 p.m., with Deputy Diane Toranzo present to assist in translating between English and Spanish. (ECF 216-2). Aguirre stated that the prior day he went to a friend's house at 1 p.m. and then to a cock fight, drinking beer. (Id., p. 6-7). From there, he went to Pretzel's Bar, where he got into an altercation. (Id., p. 7-9). Police arrived, Aguirre was told to go home. (Id., pp. 8-10).

The bar closed at 2 a.m. and he and his friends went to Salvador's house on Alma Drive, which is a few streets from his home on Vagabond Way, to drink more beer. (Id., pp. 11-12; 15-17). Aguirre estimated they arrived at Salvador's house at 2:30 to 2:45 a.m. (Id., p. 13). Aguirre claimed that after that point, he did not remember anything until he arrived home when the sun was up. (Id., pp. 13-14). After he was initially interviewed by Perez, he went back to Salvador's. (Id., p. 19-20). Aguirre stated that on one occasion, three to four weeks before, he was drunk and had walked into the Williams residence. He was told to leave or the police would be called. (Id., pp. 22-23).

Approximately 13 minutes into the interview, Negri asked to see Aguirre's shoes. Aguirre asked why, and Negri responded that investigators were checking everyone's shoes. (Id., pp. 33-35). It was at this point that Aguirre abruptly changed his story and said that he had information for the investigators. He asked if he could speak to the Spanish-speaking deputy, Toranzo, alone. (Id., p. 35-36).

Aguirre then admitted to Toranzo that he had found the body of Cheryl that morning; he stated that he was in the country illegally, did not wish to go back to Honduras, and that this was why he did not call the police when he found Cheryl. (Id., p. 37, 42, 44). Aguirre said he believed he went to the Williams residence at 6 or 6:30 a.m. (Id., p. 39-40). Aguirre admitted that he found "them" dead and did not

12

call the police and instead went home to sleep. (Id., p. 38; 58). Aguirre stated that his shoes and hands were "full of blood". (Id.)

The other investigators returned and Toranzo told them that Aguirre had admitted to being in the scene and had blood on his shoes. (Id., p. 43). Hemmert was alerted and came to the interview. Questioning continued, with questions posed to Aguirre by Francisco Hidalgo of the Florida Department of Law Enforcement (FDLE). (Id., 51-52, 66; ECF 216-3).

Aguirre was read his Miranda rights. (Id., pp. 5-7). During a series of background questions, Aguirre answered that he worked at a restaurant. (Id., pp. 11-12). Aguirre stated that he wanted to tell the truth but feared deportation. He was drunk the night before and didn't remember "very well." (Id., pp. 28-29). Aguirre stated that when he got to the house, the sun was up, and he opened the door, seeing the body of Cheryl. (Id., p. 30). He was asked what happened to his bloodied clothing and he told Hidalgo that he put the clothing on his roof, in a bag, over his bedroom. (Id., p. 33).

Aguirre claimed that, when he went back to Salvador's house that day, Salvador told him that a "Puerto Rican" had followed Aguirre home and started hitting him (Aguirre). Salvador told him that "the lady" – presumably Cheryl – said "What the fuck you doing with my friend?" whereupon the unknown Puerto Rican

hit Cheryl and took her inside. Aguirre added that he did not know if any of that story was true or not because he remembered none of it.  (Id., pp. 39-40, 45). Salvador's home was three blocks away from Aguirre's home.  (Id., pp. 48-49).

Aguirre was asked why he went into the Williams residence, and he replied to obtain beer. (Id., p. 50).  Aguirre was asked again for his shoes and responded that they would have blood on them.  (Id., pp. 71-72).  Aguirre was later asked for more details about what he did after discovering Cheryl's body.  He stated he went to the bathroom, took off his clothes, took a shower, put the bloodied clothes in a bag, and threw the bag on the roof when the police came.  (Id., p. 111).

Aguirre denied seeing a weapon and claimed he ran out of the home.  (Id., p. 114-115, 125-126).  Aguirre asked to speak to an attorney and the interview was concluded. (Id., p. 154-155). Shortly thereafter Aguirre was arrested for tampering with evidence.  (ECF 236-19). The following day a judge found probable cause and ordered him held with zero bond, pending review on June 25, 2004.  (ECF 236-20).

### Further Investigation During and After Aguirre Interview

The Volusia County Medical Examiner's Office arrived on scene at around 7:45 p.m. to retrieve the bodies of Cheryl Williams and Carol Bareis.  (ECF 236-5, p. 54). At the time, Seminole County contracted with the Volusia County Medical Examiner's Office to provide those services. (ECF 193, p. 113).

At 9:15 p.m., Negri and Bean conducted an audio-recorded interview of Amparo "Salvador" Prado-Cisneros. Salvador stated that he and Aguirre left Pretzel's at approximately 2 a.m. and went to his residence, that Aguirre left between 3 and 4 a.m., and that Aguirre returned later in the afternoon. (ECF 236-12).

Salvador stated that he and Aguirre then discussed the fact of the murders. Salvador told investigators that he teased Aguirre that Aguirre had committed the murders. Aguirre could not remember whether he committed the murders due to being drunk. (ECF 236-17, pp. 27-28). Aguirre told Salvador that he could not even remember being with friends the night before. (Id., p. 28). [10] At 11:35 pm, CSA Grossi and Craig photographed Aguirre, collected fingernail scrapings, a buccal swab, and the shoes Aguirre was wearing. (ECF 236-5, pp. 40, 54).

On June 18, 2004, Espinosa was interviewed and stated that he had taken a chef knife from the restaurant where the men, including Aguirre, worked. He had last seen it a week prior and it was kept in the kitchen the men shared. Aguirre knew of the knife and used the kitchen. (ECF 236-21, p.14, 17-19).

On June 18, 2004, John Andrich, the chef of the restaurant where Aguirre worked, was interviewed. (ECF 236-22). Andrich stated that there were knives

---

[10] Aguirre later told his defense-retained psychologist that he had significant memory deficits for that night. (ECF 236-18, p. 166-171).

15

missing from the restaurant and one he described as missing was similar to the murder weapon. (Id., pp. 7-8).

For approximately eight days between June 17, 2004, and June 24, 2004, Grossi and others collected potential evidence at 117 and 121 Vagabond Way. (ECF 236-5, p. 54). Investigators collected samples of suspected blood and documented footprints from the Williams residence, including approximately 150 samples of suspected blood. (ECF 194, p. 125, 143-144).

In consultation with the State Attorney's Office, the following items (or swabs from them) taken from 117 Vagabond Way were sent in an initial submission to FDLE for DNA testing: JG 2 A and B, Aguirre's White Nike socks; JG 3, Aguirre's black shirt; JG 4, Aguirre's Nike shorts; JG 6 buccal swabs from Aguirre; JG 8 Aguirre's blue boxer briefs. (ECF 236-5, p. 8-36, 61; ECF 193, pp. 218-19).

Four samples, KK 2, 4, 6, and 8, taken from the knife, four samples, two each from the left and right shoes and shoelaces of Aguirre, marked CC 3 A and B, and 4 A and B, were sent to FDLE for testing. Swabs and sex kit samples for Cheryl and Bareis, ME 14-17 were sent. Lastly, JO-8B, an area of ridge detail from the knife, was also sent. (Id.)

In a report dated October 8, 2004, FDLE Crime Laboratory Analyst Cathrine Johnson (formerly Mediaas) noted that samples were received by FDLE on June 21,

2004, and August 6, 2004. She reported that the DNA of Cheryl was found in blood on all of Aguirre's clothing items. The DNA of both Cheryl and Carol was found on different parts of the knife. (ECF 199-1).

On June 25, 2004, Hemmert went to the jail and arrested Aguirre for two counts of homicide. (ECF 236-12).

### Prosecution of Aguirre

On July 13, 2004, Assistant State Attorney Pat Whitaker empaneled a grand jury which returned an indictment of Aguirre for two counts of premeditated murder. (ECF 236-28).[11] Hemmert provided a copy of the Major Crimes Binders assembled in this case to prosecutors. There were three binders, in total. The binders included photographs taken during the investigation, a recording of the 911 call, audio recorded and transcribed interviews of numerous people, including Van Sandt, Samantha, Aguirre, Weaver, Brown, Prado-Cisneros, and John Andrich, and the criminal intelligence reports received on them. (ECF 214). Among these intelligence reports was the report from 2001 in which Samantha was committed under the Baker Act.

---

[11] There is no recording or transcription of the grand jury proceedings. Both Hemmert and Grossi are identified on the indictment as having testified.

17

The material in the Binders was turned over to the State Attorney at least as of September 1, 2004, because on that date the State Attorney made a disclosure to the Public Defender's Office of a long list of items, including those from the Major Crimes Binders. (ECF 236-29).

To defend Aguirre, the Public Defender assigned Timothy Caudill as Aguirre's lead trial counsel. To assist Caudill, sitting second chair was James Figgatt, an assistant public defender. At the time of Aguirre's trial, they had worked with each other on numerous cases as they were the two attorneys assigned to the capital division to handle the defense of all capital cases assigned in Seminole County. They began defending Aguirre shortly after he was arrested on June 17, 2004, on tampering charges and in anticipation of Aguirre being charged with murder. (ECF 188, p. 16).

Caudill first met with Aguirre prior to his arrest for murder and was told by Aguirre that he had touched the knife used in the murder. (ECF 188, pp. 141-142). Caudill then received the arrest report for the murders which indicated that Aguirre's palm print was found on the knife. (Id.). Caudill went to the murder scene soon after his office was appointed and spoke to three individuals, at least one of whom discussed the argument between Samantha and Cheryl. (Id.).

18

Caudill and Figgatt both testified in this case that they were aware, prior to the trial, of the following facts (among many others): the law enforcement report of Samantha's 2001 Baker Act incident; the argument the night before the murders between Cheryl and Samantha; Samantha having intermittent explosive personality disorder; and that none of the approximately 150 blood samples from 121 Vagabond Way had been sent to FDLE for DNA testing. (See e.g. ECF 188, p. 30-31, 52-53, 202).

Aguirre's defense team did not believe it necessary to make further inquiry into Samantha as a potential alternative suspect, nor did Aguirre ask them to. (Id., p. 60-61; ECF 187, p. 126). As to DNA testing of the samples from 121 Vagabond, the decision was made by Caudill and Figgatt not to seek further testing of blood samples from 121 Vagabond. (ECF 188, p. 58).

## Criminal Trial

The trial of Aguirre was held between February 20 and 28, 2006. A complete transcript was filed in the district court. Hemmert did not testify at the trial, Grossi did. (ECF 236-1, pp. 174-239).

The defense called only Aguirre to the stand. However, just before he was to come forward and take the stand, Caudill advised the trial court that he believed that Aguirre was going to perjure himself. A lengthy discussion between Aguirre's

19

counsel and the court ensued.  Aguirre's attorneys then spoke to Aguirre.  They announced that they had resolved the issue and Aguirre proceeded to testify.  (ECF 236-1, pp. 736-741).  The trial was videotaped and the portion capturing the discussion of Aguirre intending to perjure himself, and then his trial testimony, are in the record.  (ECF 229).

Aguirre had originally said that he saw no weapon and immediately left 121 Vagabond when he discovered Cheryl dead and that he went no further into the home.  At trial, however, Aguirre changed his story yet again, stating for the first time that after he discovered Cheryl's body, he picked her up.  He provided an awkward demonstration to the jury. (ECF 229).

Aguirre testified that after he discovered the body of Bareis in the room down the hall he returned to Cheryl's body, found the knife, picked up the knife, and walked throughout the house with the knife, including into Samantha's room, before leaving.  (ECF 236-1, pp. 750-754). He placed his bloodied clothes into a plastic bag, putting the bag on the roof of his residence. (Id., p. 755-761). Aguirre was convicted by the jury and later sentenced to death.

**Birks Investigation**

In March 2007, over a year after Aguirre's conviction, an intern at the Sheriff's Office complained that Birks was rude, and that Birks had her (the intern) verify fingerprint analysis even though she was not qualified to do so. Then- Sheriff Don Eslinger responded to this complaint by authorizing an administrative review of the latent print unit. (ECF 236-31).

As part of the investigation into the unit, five sets of fingerprint identifications were reexamined by FDLE personnel. One of these was the Aguirre palmprint on the knife. On June 4, 2007, it was reported to Sheriff Eslinger that FDLE investigators had determined that in the Aguirre case "no latent prints of value for identification purposes were noted." (Id., p. 10). This was reported to the State Attorney (including an additional review by Ron Smith & Associates) who then filed a notice to the court on August 29, 2007. (ECF 236-32). Importantly neither FDLE nor Ron Smith & Associates alleged that the Aguirre palmprint was fabricated, instead concluding that there was not enough of the latent print to use to make a match based on their standards. To this day, with the palmprint available to compare, Aguirre cannot be excluded as a potential match. Additionally, there is no evidence that the Sheriff, Hemmert, or Grossi were aware of any such issues involving Birks prior to the complaint.

21

**Motion for New Trial and Direct Appeal by Caudill**

On September 6, 2007, Aguirre's defense team filed a motion for new trial based on newly discovered evidence in the form of criticism of Birks' palm print identification. (ECF 236-33). The motion was denied on October 16, 2007. (ECF 236-34). Aguirre appealed and on March 26, 2009, the Florida Supreme Court denied it, concluding that the palmprint identification was irrelevant because Aguirre admitted at trial that he picked up the knife and because there was a "vast amount of evidence" against Aguirre. *Aguirre*, 9 So. 3d at 603.

**Post Conviction Appeal by CCRC**

Under Florida law, once the direct appeal of a capital conviction has been denied, the defendant is appointed new counsel from the Office of Capitol Collateral Regional Counsel (CCRC). In this case, that was Marie Parmer and Maria Deliberato. The following filings and other actions are relevant to the instant matter:

In 2012, Assistant State Attorney James Carter checked the system for entries concerning Samantha, saw additional entries post-dating the 2006 trial, and filed a motion seeking in camera review of police reports concerning Samantha Williams based on counsel's belief that the reports should be disclosed to the defense. (ECF 211; ECF 236-35). On January 25, 2013, the Court ordered their disclosure to the CCRC attorneys. (ECF 236-36).

22

Aguirre's CCRC attorneys filed a series of motions beginning June 12, 2012, seeking additional testing of DNA evidence from 121 Vagabond Way. (ECF 236-37). The motions were granted in part and denied in part at various points (ECF 191-17).

FDLE eventually issued a series of reports that in sum concluded that, of the 150 samples tested from 121 Vagabond, Samantha's DNA appeared in eight of them. None of the samples containing Samantha's DNA were near the bodies of Cheryl or Bareis – they weren't even in the same rooms as the bodies -- and all were in the portion of the residence occupied by Samantha, including her bathroom and kitchen area. (ECF 194-14; ECF 194, pp. 191-193; ECF 191, p. 17; ECF 192, pp. 54-55). Ms. Deliberato confirmed that none of the DNA samples from Samantha were found in the rooms with the bodies. (Id., pp. 58-59).

None of the samples contained a mixture of Samantha's blood with either or both of the victims. (Id., p. 58; ECF 199, pp. 98-99). The samples could not be aged for purposes of determining when they were deposited, nor could Johnson testify as to how blood containing Samantha's DNA was deposited. (ECF 199, p. 98).

A series of evidentiary hearings were held over two years based on a thrice-amended motion to vacate. (ECF 236-38, 39, 40, 41). In the third version of the motion, Aguirre's attorneys pointed to statements by Samantha beginning in 2010

23

which he alleged were self-incriminating.[12]   The trial court denied relief, but the

Florida Supreme Court vacated the convictions and sentence on October 27, 2016,

holding that Aguirre should receive a new trial based on Samantha's statements

beginning in 2010 and the additional testing of blood samples in 2012. *Aguirre*, 202

So.3d 785.

### (ii)    Standard of Review.

This Court reviews a grant or denial of a summary judgment de novo.  *Ellis*

*v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005).   Summary Judgment is

appropriate "if the moving party establishes that there are no genuine issues as to

any material fact and he is entitled to a judgment as a matter of law."  *Livernois v.*

*Medical Disposables, Inc.*, 837 F.2d 1018, 1022 (11th Cir. 1988).

This also applied to denials of summary judgment based on qualified

immunity. *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020).  "In making

this determination, we 'view the evidence and all factual inferences therefrom in the

light most favorable to the non-moving party, and resolve all reasonable doubts

---

[12] Aguirre's counsel alleged that in a police report from 2012 Samantha in the back of a police car "made admissions of guilt" to the murders of Cheryl and Bareis.  The statement cited by Aguirre in the motion is that Samantha said "her mother and grandmother died because of her." (ECF 236-41, p. 52-54). Additionally, Aguirre references a 2010 police report which indicates that while being Baker Acted she stated "I deserve to fucken (sic) die!" (Id., p. 55).

about the facts in favor of the non-movant.'" *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)).

## SUMMARY OF THE ARGUMENT

This is an appeal of a denial of qualified immunity to Hemmert and Grossi, two hard working Seminole County Sheriff's employees who followed the undisputed evidence in concluding that Aguirre killed Cheryl and Bareis. The record is complex, but the relevant facts are undisputed and based on those facts it is readily apparent that Hemmert and Grossi are at least entitled to qualified immunity on the §1983 claims against them.

As to the malicious prosecution claim against Hemmert in Count III, there is debate even at the Supreme Court as to whether this is accurately described as a Fourth Amendment right based on probable cause at the time of arrest. Shortly after arrest Aguirre was indicted by a grand jury at the behest of the prosecutor and this logically, practically, and legally should preclude liability to Hemmert for any detention *after* that indictment.

But even if it is a Fourth Amendment claim and encompasses the entirety of Aguirre's detention, and even if the district court was correct in evaluating the claim based on probable cause for initial arrest, the district court mis-analyzed the legal issues associated with probable cause. The facts in this case establish probable cause or at least arguable probable cause for the arrest of Aguirre for the two murders and so Hemmert should have received qualified immunity on Count III.

26

The district court's analysis of the claim of an unconstitutionally inadequate investigation, both with regard to the malicious prosecution claim as to Hemmert in Count III and the claim of an inadequate investigation as to Hemmert and Grossi in Count IV, is legally incomprehensible. There is no discussion of what the clearly established law was at the time, and under the circumstances at the time, so as to correctly test qualified immunity, and the district court simply speculated as to what further investigation could have found at the time.

The criticisms of Hemmert's role in the investigation are identical in the district court's analysis of Counts III and IV. Grossi is not named in Count III and the only fault the district court had with Grossi as to Count IV was that she did not collect buccal swabs from Samantha (who was rightfully believed at the time to be a collateral witness) and did not send out for DNA testing items of blood evidence from the murder scene. There is no lawful basis for the conclusion that the Constitution requires that all blood samples from a crime scene be sent out for DNA testing, else the constitutional rights of the suspect are violated.

And what samples had been DNA tested and what samples had not been tested was fully known to Aguirre's criminal defense attorneys who chose not to seek further testing. If those attorneys did not believe further testing was needed, it cannot

be said that it was clearly established that Grossi or Hemmert were constitutionally obligated to seek such testing at the time of the investigation.

Qualified immunity is objective and is analyzed at the time of the alleged unconstitutional conduct. The district court's legal analysis of the investigation in 2004 cannot be influenced by – but clearly was influenced by – Samantha's statements in 2010 or later and by additional forensics completed even after that. The district court's reasoning on the §1983 claims is incorrect at every level and Hemmert and Grossi are entitled to summary judgment on those claims, at least based on qualified immunity.

As to the state law IIED claim, the evidence does not support the basic elements of the tort and both Hemmert and Grossi should receive the benefit of the immunity described in §768.28(9)(a), Fla. Stat.

The Court should reverse the denial of summary judgment to Hemmert and Grossi as to Counts III, IV, and VII.

## ARGUMENT AND CITATIONS OF AUTHORITY

I.  **HEMMERT AND GROSSI ARE ENTITLED TO SUMMARY JUDGMENT ON THE §1983 CLAIMS FOR MALICIOUS PROSECUTION AND FOR CONSTITUTIONALLY INADEQUATE INVESTIGATION. NEITHER HEMMERT NOR GROSSI VIOLATED AGUIRRE'S CONSTITUTIONAL RIGHTS AND BOTH OF THEM ARE AT LEAST ENTITLED TO QUALIFIED IMMUNITY FROM SUIT.**

In assessing a claim of qualified immunity, a district court must consider whether, "taken in the light most favorable to the party asserting the injury… the facts alleged show the officer's conduct violated a constitutional right," and, if so, "whether the right was clearly established."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Courts may consider those distinct questions in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In this case, the undisputed facts demonstrate that Hemmert and Grossi did not violate Aguirre's constitutional rights and that whatever criticisms have been offered by Aguirre or the district court fall well short of a violation of clearly established law.

A.  **Qualified immunity standard applicable to all §1983 claims.**

"Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994)

29

(en banc) (internal quotations and citations omitted). Hemmert and Grossi were acting within their discretionary authority as government officials, and so Aguirre bears the burden of proof to show that they are not entitled to qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

This Court has held that a constitutional right may be clearly established in one of three ways: (1) "case law with indistinguishable facts clearly establishing the constitutional right"; (2) "a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right"; or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009).

 "[F]or judge-made law, there is a presumption against wide principles of law." *Vinyard v. Wilson*, 311 F.3d 1340, 1350–52 (11th Cir. 2002). "A 'duty-to-act-reasonably' standard, by itself, is almost always too general a proposition to give meaningful notice to a public official that what he, in the specific circumstances, is doing violates established federal law." *Marsh v. Butler Cnty., Ala*., 268 F.3d 1014, 1031 (11th Cir. 2001). "[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so 'with obvious clarity' to the point that every objectively reasonable government

30

official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard*, 311 F.3d at 1351. "[O]fficials are not obligated to be creative or imaginative in drawing analogies from previously decided cases," and an "official's awareness of the existence of an abstract right ... does not equate to knowledge that his conduct infringes the right." *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) (alteration in original) (citations omitted).

The relevant inquiry is whether it would be clear to an officer that his conduct was unlawful *in the situation he confronted.*" *Saucier*, 533 U.S. 194–95 (emphasis added). "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, *in the defendant's place*, that 'what he is doing' violates federal law." *Lassiter* 28 F.3d at 1149–50, citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987) (emphasis added). "[C]ourts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" *Id.*; *See Anderson*, 483 U.S. at 639–41.

31

**B.** **Hemmert is entitled to judgment on Aguirre's claim in Count III for violation of a constitutional right to be free from malicious prosecution.**

> **1.** **The Fourth Amendment is not the correct foundation for a §1983 malicious prosecution claim, and even if it were, the fact of a grand jury indictment in this case terminated the Fourth Amendment as the basis for a claim based on Aguirre's continued detention, breaking the chain of causation.**

The district court analyzed the §1983 malicious prosecution claim in Count III as a Fourth Amendment claim and held that Hemmert was not entitled to summary judgment on that claim because it was not established that Hemmert had at least arguable probable cause for Aguirre's arrest. (ECF 297, p. 21). The court in turn based this conclusion on the question of whether probable cause that existed at the time was the result of a constitutionally inadequate investigation. (*Id*., p. 22). The district court erred at every level of this reasoning.

There is substantial criticism of the theory that malicious prosecution is "housed" in the Fourth Amendment, including recently in a dissent by Justice Alito in *Thompson v. Clark*, ___ U.S. ___, 142 S. Ct. 1332 (April 4, 2022). "[I]n fact, the Fourth Amendment and malicious prosecution have almost nothing in common." *Thompson*, 142 S.Ct. at 1341 (Alito, J, dissenting). The elements of an unreasonable seizure claim and a claim of malicious prosecution do not overlap and the Fourth Amendment deals with seizures, not prosecutions. *Id*., p. 1347.

The district court in this case failed to distinguish between the arrest and the subsequent prosecution, ignoring the basic differences between the roles of the police and of the prosecution. Here, for example, Hemmert and others conducted an investigation beginning on June 17, 2004, when the bodies were found. Aguirre was arrested for tampering with evidence on that date, and even he does not deny probable cause for that initial arrest.

Aguirre was then re-arrested by Hemmert on June 25, 2004, for the murders. But *then* it was the State Attorney that presented the murder charges to a grand jury, which indicted Aguirre on July 13, 2004. As a matter of law, the intervening act of the State Attorney in obtaining a grand jury indictment terminates Hemmert's legal responsibility for Aguirre's continued detention after the date of the indictment. *Jones v. Cannon*, 174 F.3d 1271, 1287 (11th Cir. 1999).

Importantly, this rule applies even if the claim is that the grand jury was in some way misled by testifying witnesses, such as Hemmert. *Id.*, citing *Mastroianni v. Bowers,* 173 F.3d 1363 (11th Cir.1999), rehearing on other grounds, 173 F.3d 1363 (11th Cir. 1999). "False grand jury testimony cannot directly impose civil liability on (the officer), and it likewise cannot be used indirectly to impose civil liability for expanded damages on the false arrest claim." *Jones*, 174 F.3d at 188-89. See also *Barts v. Joyner*, 865 F.2d 1187, 1195-96 (11th Cir. 1989) (intervening

acts of prosecutor, grandy jury, judge and jury break the chain of causation as between the arrest and detention subsequent to prosecution).[13]  See also *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (per curiam) ("It is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party.")

Moreover, there is no claim in this case that Hemmert testified falsely to the grand jury.  First, there is no transcript of his testimony to the grand jury on which to base such a claim.  Second, the only item which could even possibly have been incorrect was the palm print identification by co-Defendant Birks, something for which Hemmert would bear no legal responsibility in the absence of any malice on his part, especially as he could not have known in 2004 that the print would be called into question in 2007.

The district court's analysis of this issue is contained in footnote 18 of the summary judgment order in which the district court stated that the Supreme Court "permitted similar claims to proceed even after an indictment," citing *Manuel v. City*

---

[13] The *Barts* court noted that there could be liability if there was deception or undue influence by the arresting officials, 865 F.2d at 1195, but since then this Court in *Jones* and *Mastroianni* has held that such a theory does not apply to grand jury proceedings because witnesses have immunity in such proceedings.

*of Joliet*, 580 U.S. 357, 369 n.8 (2017).  But the actual holding in *Manuel* was that a detention based on probable cause found by a judge, which in turn was allegedly based on falsified evidence, could sustain a Fourth Amendment claim for the continued seizure up through trial.[14]  The actual holding of the majority in that case, however, did not involve an intervening grand jury indictment.

In his dissent, Justice Alito wrote that the Fourth Amendment is not the correct constitutional foundation for a §1983 malicious prosecution claim.  *Manuel*, 580 U.S. at 374-85.  "There is a severe mismatch," Justice Alito wrote, "between these elements and the Fourth Amendment."  *Id*. at 378.  It is prosecutors, not the police, who decide to initiate or terminate a prosecution.  And, an element of common law malicious prosecution is malice, whereas Fourth Amendment inquiries are purely objective.  *Id*.

This Court should conclude that the Fourth Amendment prohibition against unreasonable seizures is not the correct constitutional foundation for a common law tort claim of malicious prosecution.  In addition or in the alternative, the Court should hold that the State Attorney's act of seeking and then obtaining a grand jury indictment on July 13, 2004, terminated the Fourth Amendment inquiry as to

---

[14] Even under the district court's reasoning *Manuel* necessarily means that any liability Hemmert or Grossi has for detention of Aguirre ended with the guilty verdict in 2006.

35

Defendant Hemmert (and Grossi), breaking the chain of causation as to him for the entirety of the remainder of Aguirre's detention pre and post-trial.

>    **2.    Even if the correct analysis of the §1983 malicious prosecution claim depends on presence or absence of probable cause or arguable probable cause, the district court erred in denying summary judgment to Hemmert as probable cause or at least arguable probable cause to arrest Aguirre was patently obvious.**

In this circuit, a claim for malicious prosecution under the Fourth Amendment "is shorthand for a claim of deprivation of liberty pursuant to legal process." *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (internal quotation marks omitted). Aguirre must establish both "that the legal process justifying his seizure was *constitutionally* infirm and that his seizure would not otherwise be justified without legal process." *Id.* (internal quotation marks omitted) (emphasis added). Because the existence of "[p]robable cause renders a seizure pursuant to legal process reasonable under the Fourth Amendment[,] ... the presence of probable cause defeats a claim that an individual was seized pursuant to legal process in violation of the Fourth Amendment." *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (internal quotation marks omitted).

Similarly, where there is at least just arguable probable cause to arrest a plaintiff then the defendant is entitled to qualified immunity on such a claim. *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010). This standard is met

when reasonable officers "in the same circumstances and possessing the same knowledge" as the defendant "*could have* believed that probable cause existed to arrest the [p]laintiff." *Id*. (emphasis added) citing *Kingsland,* 382 F.3d at 1257 (abrogated on other grounds by *Williams*). This is an objective inquiry, based on the facts known to Hemmert at the time. *Grider*, 618 F.3d at 1257.

At the time he arrested Aguirre for the murders on June 25, 2014, Hemmert knew of at least the following key facts:

1) Aguirre initially lied to deputies canvassing the neighborhood on the morning of June 17, 2004, the date the bodies were discovered, claiming he had no knowledge of the murders and had been at a bar, went to a friend's home until 2 a.m., drinking until 5:45 or 6:00 a.m., going home and sleeping until 10 a.m.;

2) Samantha's boyfriend, Van Sandt, reported to Hemmert that Aguirre had been caught in the Williams residence previously, in the middle of the night and uninvited. On one occasion, Aguirre had been found in the home, standing over Samantha as she slept in her bed; Aguirre admitted in a later interview that same day that he was warned that he was not welcome there and that police would be called if he again came in uninvited;[15]

---

[15] The district court order sanitizes this, stating that Aguirre was warned not to come into the house unannounced and uninvited in the middle of the night simply because the Williams had an aggressive dog. (ECF 297, p. 3).

37

3) Aguirre left the area of the murders but returned home later that day, in the early evening of June 14, 2004. Aguirre was interviewed a second time and it was not until that interview was underway -- when deputies asked to see Aguirre's shoes based on bloodied shoe prints in the murder scene -- that Aguirre for the first time admitted to being in the murder scene;

4) Aguirre again appeared to be untruthful in that he claimed that he had only gone so far as the body of Cheryl but the bloodied shoe prints which upon gross examination matched Aguirre's went throughout the house, including into the room where Bareis' body was found;

5) Blood was in fact found on the bottom of Aguirre's shoes;

6) The bloodied murder weapon was found in Aguirre's yard, next door to the victims' residence;

7) A fingerprint examination determined that Aguirre's palm print matched a print found on the murder weapon. While the sufficiency of this print is the subject of ongoing litigation in this case, Hemmert had no reason to doubt the identification at the time;

8) The bloodied knife found in Aguirre's yard matched one missing from Aguirre's place of work. Aguirre's roommate admitted that either he had taken a

matching knife home from the restaurant where both of them worked, and stated that he could not locate the knife in the house after the murders;

9) Aguirre had placed his bloodied clothes into a bag and thrown them on the roof of the shed. Cheryl's blood soaked through to his underwear;

10) Aguirre's friend Amparo "Salvador" Prado-Cisneros was interviewed and he reported that Aguirre left his residence between three and four a.m. on the morning of the murders, then returned to the friend's place, stating he could not remember whether he murdered his neighbors.

The district court refers to the investigation and the probable cause affidavit that followed as "selectively including information in the affidavit to point to Aguirre and excluding doubts and inconsistencies implicating (Samantha)." (ECF 297, p. 24). That is not the right legal question and, respectfully, if the above facts do not amount to probable cause, or at least to arguable probable cause, then one must wonder what would.[16]

Moreover, the "doubts" and "inconsistencies" which the district court describes as "implicating" Samanta were tiny compared to the evidence overwhelmingly pointing to Aguirre as the murderer at the time. The district court

---

[16] Even absent the palm print match there was probable cause or at least arguable probable cause to arrest Aguirre.

stated that "In evaluating probable cause, an officer may not be willfully blind and choose not to obtain readily discoverable information that may exculpate a suspect, nor may he ignore discrepancies giving rise to doubts about the guilt of a suspect." (Id., citing *Kingsland*).  But then the district court failed to apply that principle in qualified immunity terms to the case at hand.

It was not remotely "clearly established" law that Hemmert was constitutionally required, given the facts known to him at the time, to identify Samantha Williams as a viable alternative suspect to the exclusion of Aguirre. Samantha and her mother argued over spilled ice cubes the night before.  Aguirre has criticized Hemmert for failing to take into account a prior police report from three years earlier that Samantha had been diagnosed with "intermittent explosive disorder" and that she had been Baker Acted as a result.  The district court cited those facts in its rendition of items known to Hemmert that might also have pointed to Samantha as the murderer.  (ECF 297, p. 26).

Again, this is entirely the wrong legal analysis.  The legal question is whether there was probable cause, or just arguable probable cause, to believe on June 25, 2017, that Aguirre had committed the murders.  The question is not whether some other further investigation *might* have yielded reason to believe that Samantha was *also* a viable suspect.

40

On this score Aguirre's own criminal defense attorneys, Caudill and Figgatt, were aware of all of this information (the argument, the Baker Act, the 2001 police report about Samantha). Yet, they placed no stock in Samantha as an alternative suspect. Those attorneys did not seek more mental health records of Samantha or try to develop her as an alternative suspect. If Caudill and Figgatt, with a year and a half to look into these issues did not see reason to identify Samanta as a suspect, it cannot seriously be contended that Hemmert was constitutionally obligated to do so in the eight days between the murders and the arrest of Aguirre for the murders.

Placed into constitutional terms as to the adequacy of the investigation, there was at the time (and still is) no caselaw under similar circumstances that would have clearly established that Hemmert was constitutionally obligated to take some other step in his investigation to consider Samantha as an alternative suspect. And again, the district court's order misses the correct legal point: the question is not whether more investigation might have created a viable defense case to point to Samantha as the murderer; rather, the correct legal question is whether there was probable cause to arrest Aguirre and it is simply beyond rational debate that there was.

41

### 3. The investigation was constitutionally adequate so as to establish probable cause, or at least arguable probable cause, to arrest Aguirre.

In the summary judgment order the district court concluded that the presence of probable cause to arrest Aguirre might be completely undermined if the investigation was not constitutionally adequate. The district court compared the evidence that Aguirre was the murderer versus evidence at least implicating Samantha. (ECF 297, pp. 25-26). The district court then described additional investigatory steps that could have been taken in light of this comparison which "could have" – key phrase "could have" -- yielded evidence that Samantha committed the murders. (ECF 297, p. 27.)

As a threshold matter, Hemmert notes that there is not a single citation in this discussion to any case from a qualifying court, predating the incident and on materially similar facts, stating for example that Hemmert (or Grossi per Count IV) was constitutionally required to submit blood stains from the murder scene for DNA testing, or to collect DNA samples from what at the time appeared to be witnesses, or to confirm whether clothes were in the washer as claimed by Van Sandt, or to test for rigor mortis, or to interview specific witnesses. In the absence of relevant qualifying caselaw, to deny qualified immunity, the Court would have to conclude that every reasonable investigator would inevitably reach the conclusion, *in these*

42

*circumstances*, that failure to take these steps was both clearly unconstitutional and precluded at least arguable probable cause to arrest Aguirre.

The district court alludes to the fact that when Hemmert interviewed Samantha he did not ask her any questions about her mental health history and accepted her explanation of a burn mark on her arm without further checking (ECF 297, p. 9). The district court in conclusory fashion stated several times in its order that Hemmert did not consider or look into the "inconsistency" when Samantha was first interviewed wherein she stated that she and Van Sandt had spent the night at a friend's house, but then stated that the couple spent the night at his parents' home. This is simply incorrect. When 21-year old Samantha stated that the couple spent the night at the friend's house Hemmert pointed out that Van Sandt had said they spent the night at his parents' house and that she had to tell the truth. Samantha replied that the couple had spent the night at the parents' house, but she had been reluctant to say so since the parents did not approve of her staying there. In the moment it was not clearly unconstitutional to accept that credible explanation.

It bears repeating that Caudill and Figgatt were aware of the argument the night before between Samantha and her mother,[17] were aware of Samantha's prior

---

[17] The court criticizes the lack of an interview of neighbor Diane Shroyer, but the only thing she had to offer – documented when she came into the room during the Weaver interview – was the fact of the argument over the spilled ice cubes. That

Baker Act and reference to intermittent explosive disorder, had the interview of Samantha conducted by Hemmert (including what the district court termed inconsistencies worth looking into), and those attorneys attached no significance to any of it, either.

Much of what the district court discussed in its order about other investigative steps that could be taken was premised entirely on speculation of evidence that may, or may not, have even existed, much less been meaningful to probable cause to arrest Aguirre. For example, the district court notes that Van Sandt's mother told Hemmert in an interview that she did not know whether Samantha had stayed the night at her home, as stated by Samantha and Van Sandt. The district court notes that no one checked the Van Sandt residence for blood evidence though Hemmert has testified that he directed that it be done. (ECF 297, pp. 9-10; 27).

First, this is all based on speculation that there was in fact blood evidence at the Van Sandt residence. That it is at best theoretically possible that, if Samantha was the murderer, and if she returned to Van Sandt's residence after the murders,

---

argument was already well known and in fact was known to the criminal defense team who did not believe it relevant. In fact, in her criminal case deposition Aguirre's attorneys asked Shroyer about the argument over the ice cubes. (ECF 188-8, p. 11). The district court does not acknowledge this.

then there might be blood evidence somewhere in this third-party location, does not undermine the probable cause on the face of the situation as to Aguirre.[18]

Other criticisms similarly fall far short of establishing a constitutional violation, much less a violation of a clearly established constitutional right. For example the district court notes that the bodies were not touched and were retrieved 12 hours later, not having been tested on scene for rigor mortis. (ECF 297, p. 10). But there is no caselaw standing for the proposition that investigators are constitutionally obligated to test every murder victim for rigor mortis.[19]

The district court notes that Cheryl was stabbed 125 times and that Samantha had a Baker Act and a reported prior diagnosis of intermittent explosive disorder. The district court concludes that Hemmert did not "account for" "overkill," which the court said "potentially" indicated a close relationship with the victim. (ECF 297, p. 27).

_____

[18] The court gratuitously remarked that Aguirre was a suspect and was Hispanic and that buccal swabs were taken from Aguirre's roommates who were also Hispanic but not from Samantha and Van Sandt, implying that Aguirre's nationality or ethnicity played some role in this investigation. There was no evidence of this.

[19] Seminole County contracted with another county for that service. Investigators did not conduct rigor mortis examinations on site and the medical examiner precluded them from doing so and informal assessment would have been meaningless. Caudill and Figgatt were aware of the rigor mortis argument, made it at the criminal trial, and unsurprisingly the jury rejected it.

45

First, "overkill" is just an amateurish psychologism. There is no authority for the proposition that an investigator would be constitutionally obligated to ignore all of the overwhelming evidence of Aguirre's guilt at the time because it was "possible" that the murderer and the victim had a close relationship.

The investigative team, led by Hemmert, sought DNA testing of blood samples from the knife, the shoes and Aguirre's clothing, all of which contained the DNA of at least one of the victims. Aguirre and the district court criticize the fact that DNA was not tested as to the blood samples inside the Williams residence, but the district court completely ignored the fact that there was no evidence that the murderer had been injured. There were no blood droplets for example near the bloodied footprints, as might be deposited by an injured attacker. (ECF 198, p. 196).[20]

The district court faults Hemmert and the investigative team for failing to test the sneakers found in a nearby dumpster for blood, to look at a box also marked "Sysco" located in the Williams residence, or to ask for DNA testing of a clump of hair found on Cheryl's body. (ECF 297, p. 27). But the fact is that Aguirre returned to the scene aware he had blood on his shoes. When interviewed for the second time

---

[20] The district court also ignored the fact that the agency performing such testing, the Florida Department of Law Enforcement (FDLE), did not allow police agencies to simply send in hundreds of blood samples. (ECF 198, p. 249).

46

he again denied that he knew anything about the murders.  It was not until well into that second interview that, when asked to see his shoes, Aguirre for the first time admitted to having been at the scene.

The district court described omissions in the arrest affidavit but it is unclear in the first place whether those claimed omissions are failure to discuss evidence implicating Samantha or failure to investigate further to *possibly* find more evidence. And the district court's order confusingly cites to inapposite cases for the proposition that "[i]t has also long been clearly established that reckless material misstatements or omissions in an arrest affidavit negating probable cause similarly violate the Fourth Amendment."  (ECF 297, p. 23), citing *Franks v. Delaware*, 438 U.S. 154, 155 (1978), *Jones*, and *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997). All three of these cases were decided in the context of a warrant application, but Aguirre was not arrested based on a warrant.

*Franks* and *Jones* both dealt with intentional misstatements of fact, in which government officials were alleged to have purposefully fabricated evidence in order to secure arrests.  The district court did not find, and there is no evidence to support an argument, that Hemmert intentionally misstated any facts in his arrest affidavit.

The district court concluded on this point that one or two of Hemmert's "omissions" might represent negligence, but that at some unidentified point "no

47

reasonable officer would plow ahead with an arrest without further investigation."
(ECF 297, p. 28). This is the very definition of arguable probable cause because no
distinction is drawn as to when the omissions are negligent versus when they become
unconstitutional and therefore cannot support probable cause.

The order cites to *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989) for the
general proposition that "due process requires that officers take steps to eliminate
doubts about a suspect before arrest." But the correct analysis is whether the specific
acts allegedly taken in this case had been previously determined, under similar facts,
to be unconstitutional or whether, in the words of this Court, the law had developed
"in such a concrete and factually defined context to make it obvious to all reasonable
government actors, in the defendant's place, that 'what he is doing' violates federal
law." *Lassiter* 28 F.3d at 1149–50 (emphasis added).

The district court cites *Tillman* for the proposition that the obligation to "take
steps to eliminate doubts about a suspect before arrest" was "clearly established" at
the time. But in *Tillman*, an undercover officer purchased marijuana from a woman
named Mary Tilma. The officer brought this information to the sheriff, who
personally knew a woman named Mary *Tillman*. The sheriff knew that Mary Tillman
did not meet the description that the undercover officer had provided but personally
typed out an arrest affidavit identifying Tillman as the person who sold the drugs.

48

The sheriff had "significant doubts" about Tillman's identity as the seller but wrote out the affidavit solely to bring Ms. Tillman in and identify or eliminate her as a suspect.   This Court denied the sheriff's claim of qualified immunity, holding that "no reasonable law enforcement officer may conclude that an arrest warrant may be obtained and an arrest made for the sole purpose of identifying a suspect."   *Id.* at 321.

*Tillman* states that "Sheriff Coley was not required to investigate every claim of innocence raised by Tillman; but he was required to investigate *his own* serious doubts regarding the suspect's identity."   *Tillman* at 321, emphasis added.  This is clearly not the situation in the case at bar in that both Hemmert and Grossi have never expressed doubt about Aguirre's actual guilt, much less probable cause.

 Notably, even the district court wrote in its opening discussion that at the time the evidence against Aguirre was "open-and-shut" and it was only over the course of two decades that the case "unraveled."  (ECF, 297, pp. 1-2).  That observation is the DEFINITION of arguable probable cause because the only facts that matter are those that exist at the time.

Aguirre had previously entered the Williams house in the middle of the night and was warned not to come back.  He lied about finding the bodies and claimed only that he found them when investigators asked to see his shoes, which he knew

had the victims' blood on them.  He lied yet again in the second interview that night when he claimed that he only went so far as Cheryl's body.  The murder weapon was in his yard.  His bloodied clothes, with the blood of the victims, was on the roof of his shed because he hid them there. He admitted to a friend he could not remember whether he killed his neighbors.

Faced with this and other evidence Hemmert had at least *arguable* probable cause to arrest Aguirre.  This Court should reverse and hold that Hemmert is entitled to qualified immunity on Count III.

**C.** **Hemmert and Grossi are entitled to judgment on Aguirre's claim in Count IV for violation of a constitutional right to a constitutionally adequate investigation.**

**1.    The district court order confuses probable cause for Fourth Amendment purposes with due process.**

"The Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released."  *Baker v. McCollan*, 443 U.S. 137, 145 (1979). "That a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself."  *Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir. 1990).

As to Count IV, the district court's order court describes the constitutional right as one of due process, see (ECF 297, p. 28), stating that an arrest without

probable cause "violates due process."  (Id., n. 24).  The court cited its own earlier order on a motion to dismiss and *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) for the proposition that "a deficient investigation lacking in even arguable probable cause violates due process just as it violates the Fourth Amendment."

The district court's citation to *Mercado* on this point is perplexing.  *Mercado* involved a claim of excessive force for firing a non-lethal baton at a suicidal person's head.  It had nothing to do with a claim of lack of probable cause for arrest or due process in an investigation.

Furthermore, the Supreme Court has held that a claim for arrest based on absence of probable cause is a Fourth Amendment claim because the Fourth Amendment is the right most specifically describing a seizure based on probable cause.  *Albright v. Oliver*, 510 U.S. 266, 277 (1994).  There is no basis to claim that there is a *procedural* due process violation based on an arrest without probable cause because the detention prior to the grand jury indictment is a Fourth Amendment issue based on probable cause and the detention past the grand jury indictment is based on the intervening acts of prosecutors, the grand jury, and the criminal court.

The district court invoked its earlier analysis of the inadequacy of the investigation and concluded that a prosecution without probable cause might also

51

represent a violation of due process. But the court did not define the law at a level that could warn Hemmert and Grossi, given the facts that were known to them at the time, that their failure to send in blood samples for example would clearly be unconstitutional.

The district court then cites due process law in terms of deliberate indifference. (ECF 297, p. 29), citing *Helm v. Rainbow City*, 989 F.3d 1265, 1278–79 (11th Cir. 2021). This is a subtle conversion of the former false arrest theory to be one of false imprisonment. See e.g. *Helm* and *Ortega v. Christian*, 85 F.3d 1521 (11th Cir.1996). Even if that theory did apply, Hemmert (and Grossi) obviously did not form the subjective impression that Aguirre was actually innocent. And, Hemmert had abundant probable cause to arrest Aguirre, anyway, such that if this formulation of a due process claim based on imprisonment could even apply here, it would be defeated by the presence of probable cause or arguable probable cause. *Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009).

The district court order states in footnote 26 that there are fact disputes about whether Hemmert ordered Grossi or another officer to photograph Samantha or check for evidence at the Van Sandt home, with Hemmert saying he did and Grossi and the (unidentified officer) saying Hemmert did not do so. For purposes of this issue, let's assume that Hemmert did not order these things. Those omissions in the

investigation are not of constitutional dimension, would matter only if one speculated that they might lead to additional evidence, and none of it was clearly established as constitutionally required under these circumstances. The failure to check the Van Sandt residence or photograph Samantha does not defeat the presence of probable cause or arguable probable cause to arrest Aguirre. [21]

The district court then cited *Daniels v. Bingo*, 487 Fed.App'x 532, 537 (11th Cir. 2012) for the proposition that "An officer recklessly disregards the truth when doubts and inconsistencies give him cause to investigate further." First, to the extent intended to be the clearly established law, the case dates from 2012 and cannot be referenced for qualified immunity purposes. Second, such a broad proposition hardly describes the clearly established law in the specific facts confronting Hemmert and Grossi. Third, *Daniels*, involved doubts the defendant had or should have had about the identity of a suspect, not adequacy of an investigation resulting in probable cause. *Daniels*, 487 Fed. App'x at 537 (an officer is required to take

---

[21] Placing this into terms of probable cause and comparing likely scenarios, the failure to check the Van Sandt residence matters only if one assumes that Samantha, with no transportation, managed to leave the Van Sandt residence undetected, return home, murder her mother and grandmother after an argument over spilled ice cubes, and then returned to the Van Sandt residence, again undetected. Compare that to the repeated lying of Aguirre, credible reports his memory was compromised by his intoxication, his bloodied footprints in the murder scene, the murder weapon in his yard, his bloodied clothes on the top of the shed, and on and on.

steps to identify the offender when he has "*serious doubts* about the identity of a suspect")  (emphasis in original).

The possibility that additional investigation *might* yield another suspect in the form of Samantha does not deny that, on the undisputed facts in this case, there was clearly probable cause or at least arguable probable cause to arrest Aguirre for the murders, defeating any iteration of this claim as "false arrest," "false imprisonment," or "due process."

### 2.    Grossi is entitled to qualified immunity.

The only grounds for denying summary judgment to Grossi, a crime scene investigator, is that she played a role in which blood samples were sent to FDLE and she did not obtain buccal swabs from Samantha.  The samples which were sent to FDLE were from the knife and Aguirre's clothes.  Although the district court order criticizes the defendants collectively for the arrest of Aguirre, it does not cite to any other basis for denying summary judgment to Grossi on any §1983 claim, other than the limited point regarding what got tested and what did not.  (ECF 297, p. 30, n. 28).  ("Grossi is not named in the malicious prosecution claim, but based on the same evidence discussed above, a reasonable jury could infer from the undisputed facts of Grossi's failure to test the 150 blood samples from the scene and failure to take any

samples from Williams that she intentionally or recklessly disregarded the potential consequences to Aguirre.").

First, this is not accurate in that it is not Grossi (or the Sheriff's Office) that does the DNA testing. Rather, the Sheriff's Office collects the samples and sends them in to the FDLE for testing. This important fact is particularly relevant because the FDLE at the time at least informally limited samples in initial submissions.[22]

Second, even if Grossi (or Hemmert) could have sought additional testing Aguirre's criminal defense attorneys were aware of what had been tested and what had not. Third, blood sample testing and comparator testing of DNA from Samantha would not have defeated probable cause as to Aguirre even if it had been done at the time of the investigation. Samantha's DNA was found in blood samples in *other rooms*, away from the murder victims. It was found in Samantha's bedroom, bathroom, and kitchen areas. Samantha's DNA could not be aged. There was no reason to think the murderer had bled as there were no indications of that, such as blood droplets next to the bloodies footprints.

---

[22] FDLE crime lab supervisor Catherine Johnson testified that currently the FDLE limits such initial submissions to five samples for violent crimes, which can be broadened later if requested. Though she could not recall the exact limitation in 2004, she testified that the agency has limited resources, serves multiple counties, and even then tried to limit submissions. (ECF 199, pp. 93-97). This is in accord with Grossi's testimony on the same point. (ECF 194, pp. 249-252)

There is no authority for the proposition that buccal swabs must be collected from all persons who, at the time, appear to be collateral witnesses. And there is no authority for the proposition that law enforcement must send off every blood sample taken from a scene, especially under circumstances like these, where the evidence is overwhelming as to Aguirre. At a minimum, the law was not clearly established on these points and so Hemmert and Grossi are entitled to qualified immunity.

This Court should reverse and hold that Hemmert and Grossi are both entitled to summary judgment on Count IV.

## II. HEMMERT AND GROSSI ARE ENTITLED TO SUMMARY JUDGMENT ON THE STATE LAW CLAIM AND BOTH OF THEM ARE AT LEAST ENTITLED TO IMMUNITY FROM THIS CLAIM PURSUANT TO §768.28(9)(a), FLA. STAT.

The tort of malicious prosecution requires proof of outrageous action which "goes beyond all bounds of decency, and [is] regarded as odious and utterly intolerable in a civilized community," *Frias v. Demings*, 823 F.Supp.2d 1279, 1288 (M.D. Fla. 2011). A lawful arrest made with probable cause can never satisfy the "outrageous conduct" element of the tort of IIED. *Eubanks v. Freburger*, Case No. 11-60714-CIV, 2012 WL 4936061, at *9 (S.D. Fla. Oct. 17, 2012); *Sada v. City of Altamonte Springs*, 434 Fed. Appx. 845, 851 (11th Cir. 2011).

Moreover, even an arrest *without* probable cause does not always satisfy the "outrageous conduct" element of an IIED claim. This Court has held that "even if

probable cause was absent, [a] claim of intentional infliction of emotional distress is not warranted, [if] the officers' actions were not sufficiently outrageous." *Id*. at 848; *Feliu v. Fernandez Rundle*, Case No. 05-20169 CIV, 2007 WL 1463866, at *4 (S.D. Fla. May 17, 2007).

Hemmert and Grossi claimed the immunity pursuant to § 768.28(9)(a), Florida Statutes. The district court acknowledges this in a footnote, stating, "Hemmert and Grossi briefly assert that they are entitled to statutory immunity…. But there are factual disputes over whether they acted in bad faith, so the claim must proceed to trial." (ECF 297, p. 33). This is the district court's only comment on this point.

"Bad faith" carries a distinct meaning in the context of § 768.28(9)(a). *Coleman v. Hillsborough Cnty*., 41 F.4th 1319, 1326 (11th Cir. 2022) ("under Florida law the *legal malice* element in a malicious prosecution claim,…is not the same as the *actual malice* exception to a sovereign immunity defense) (emphasis in original). Courts construing the bad faith prong of § 768.28(9)(a) use the "actual malice" standard, *Parker v. State Bd. of Regents ex rel. Fla. State Univ*., 724 So.2d 163, 167 (Fla. 1st DCA 1998), which means the conduct must be committed with "ill will, hatred, spite, [or] an evil intent," *Reed v. State*, 837 So.2d 366, 368–69 (Fla. 2002). Conduct meeting the wanton and willful standard is "worse than gross

57

negligence," *Sierra v. Associated Marine Insts., Inc*., 850 So.2d 582, 593 (Fla. 2d DCA 2003).

Neither Aguirre nor the district court points to any evidence which would support the inference that Hemmert and Grossi were motivated by "actual malice." This Court should reverse the denial of summary judgment as to Count VII.

## **CONCLUSION**

This Court should reverse the denial of summary judgment to Hemmert on Count III and the denial of summary judgment to Hemmert and Grossi on Counts IV and VII.

58

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that, pursuant to FRAP 32(a)(7)(B) and 11th Cir.R. 32-4 regarding type volume limitations, according to the word processor program used to create the foregoing, this Initial Brief contains 12,980 words, exclusive of those portions identified in 11th Cir.R. 32-4.

*s/ Thomas W. Poulton*
THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
ROBERT D. HOLBORN, II, ESQ.
Florida Bar No.:  44186
*holborn@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:   321-203-4304
Attorneys for Appellants/Cross-Appellees
Hemmert and Grossi
and Cross-Appellee Sheriff Lemma

59

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of August 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*s/ Thomas W. Poulton*
THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
ROBERT D. HOLBORN, II, ESQ.
Florida Bar No.:  44186
*holborn@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:   321-203-4304
Attorneys for Appellants/Cross-Appellees
Hemmert and Grossi
and Cross-Appellee Sheriff Lemma
